**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL MILLER,** | : | |
| **Plaintiff** | : | **No. 1:25-cv-00759** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **YORK COUNTY REGIONAL** | : | |
| **POLICE DEPARTMENT, CHIEF** | : | |
| **TIMOTHY DAMON, and THE YORK** | : | |
| **COUNTY REGIONAL POLICE** | : | |
| **BOARD OF COMMISSIONERS,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court is Defendants York County Regional Police Department ("the Department"), Chief Timothy Damon ("Chief Damon"), and the York County Regional Police Board of Commissioners ("the Board") (collectively, "Defendants")' motion to dismiss (Doc. No. 31) Plaintiff Daniel Miller ("Plaintiff")'s amended complaint (Doc. No. 28). For the reasons that follow, the Court will grant the motion.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff is an adult individual residing in York County, Pennsylvania. (Doc. No. 28 ¶ 3.) He has been employed by the Department continuously since 1999. (Id.) Prior to November 2021, he held the rank of Corporal, "served in numerous specialized assignments," and maintained a "current certification authorizing his service as a municipal police officer." (Id. ¶ 7.) Chief Damon is the Department's Chief of Police and is responsible for "personnel

[1] The factual background is drawn from Plaintiff's amended complaint (Doc. No. 28), the allegations of which the Court accepts as true for purposes of the pending motion to dismiss. See Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017).

decisions, discipline, and operations" within the Department. (Id. ¶ 5.) The Board is the "governing body with final policymaking authority over [the Department], responsible for oversight, personnel actions, and enforcement of the Collective Bargaining Agreement" ("CBA"). (Id. ¶ 6; Doc. No. 28-4.)[2]

Plaintiff alleges that, on November 14, 2021, he was called in to oversee the Department's active investigation of a domestic violence incident involving Marisa Vicosa, Robert Vicosa, and their two minor children. (Doc. No. 28 ¶¶ 8–10.) That same day, Plaintiff coordinated with the York County District Attorney's Office and the Department's Lieutenant G. Kenneth Schollenberger to assist Ms. Vicosa in applying for and obtaining an emergency protective order for herself and her two children following the domestic violence incident. (Id. ¶ 11; Doc. No. 28-1 at 2–4.)[3]

Plaintiff asserts that, while Ms. Vicosa was in the process of obtaining the protective order, he received a call from Lt. Schollenberger "order[ing] him not to attempt service" of the protective order because "Chief Damon did not want to 'escalate' the situation and preferred to serve a search warrant instead at 8:00 a.m. the following morning, once the children were expected to be on the school bus." (Doc. No. 28 ¶ 13.) Plaintiff questioned the legality of this order and sought clarification from Lt. Schollenberger, who directed Plaintiff to contact Chief Damon directly. (Id.) When Plaintiff attempted to contact Chief Damon via telephone and text message, Lt. Schollenberger ordered Plaintiff to stop contact and "confirmed the 'stand down'

---

[2] Plaintiff files as Exhibit 4 to his amended complaint the CBA between the York County Regional Police Commission and the York County Regional Police Association, effective from January 1, 2022 to December 31, 2026. (Doc. No. 28-4.)

[3] Plaintiff files as Exhibit 1A to his amended complaint the November 14, 2021 Order granting Ms. Vicosa and her two children emergency protection from abuse. (Doc. No. 28-1 at 2–4.)

order" from Chief Damon. (Id. ¶ 14). Chief Damon did not respond to the phone call or text message from Plaintiff. (Id.) Plaintiff relayed the "stand down" order to subordinate officers, who also questioned the legality of the directive. (Id. ¶ 15.)[4] Despite his concerns, Plaintiff complied with the order. (Id.)

Plaintiff asserts that, on November 15, 2021, he met with Ms. Vicosa following her forensic examination related to the domestic violence incident to inform her that the protective order had not been served. (Id. ¶ 16.) When Ms. Vicosa asked why it had not been served, Plaintiff "truthfully stated the decision came from the Chief of Police." (Id.) Ms. Vicosa asked whether it was the same Chief of Police who lived in her neighborhood and asked how she could file a complaint against him. (Id.) Plaintiff explained that she could file a complaint either through the Department or through the York County District Attorney's Office. (Id.) Ms. Vicosa filed a private criminal complaint against Chief Damon the same day. (Id. ¶ 21; Doc. No. 28-1 at 1.)[5] At this meeting, Plaintiff "also informed Ms. Vicosa of the planned 8:00 a.m. search warrant." (Doc. No. 28 ¶ 17.) Ms. Vicosa "disclosed that her children were homeschooled and would not be leaving the residence." (Id.) Plaintiff notified Lt. Schollenberger of this

[4] Plaintiff files as Exhibit 2 to his amended complaint the Department's Rules of Conduct, effective March 22, 2021. (Doc. No. 28-2.) Plaintiff also files as Exhibit 10 to his amended complaint the Department's updated Rules of Conduct, effective January 1, 2022. (Doc. No. 28-10.) Plaintiff alleges that, per these Rules of Conduct, subordinate officers are permitted to raise concerns about orders they believe to be illegal or unethical. (Doc. No. 28 ¶ 18.) Plaintiff files as Exhibit 11A to his amended complaint the Department's General Order on the duty to intervene, dated September 11, 2025, which provides the Department's policy of intervening in police officer misconduct. (Doc. No. 28-11 at 8–10.) Plaintiff files as Exhibit 11B to his amended complaint the Department's General Order setting forth the oath of office, dated December 1, 2023. (Doc. No. 28-11 at 11–12.) Plaintiff files as Exhibit 11C to his amended complaint a copy of Pa. State Police v. Pa. State Troopers Ass'n, 840 A.2d 1059 (Pa. Commw. Ct. 2004). (Doc. No. 28-11 at 13–16.)

[5] Plaintiff files as Exhibit 1 to his amended complaint the first page of Ms. Vicosa's private criminal complaint against Chief Damon. (Doc. No. 28-1 at 1.)

information, to which Lt. Schollenberger replied that he "'did not know what to tell him.'" (Id.)

Plaintiff alleges that, also on November 15, 2021, he "spoke confidentially" with Detective Derek Hartman from the York County District Attorney's Office "while off duty" about "his concerns regarding Chief Damon's illegal order." (Id. ¶ 18.) The next day, Detective Hartman advised Plaintiff that he had relayed Plaintiff's concerns to District Attorney Dave Sunday. (Id.)

On November 17, 2021, Lt. Schollenberger assigned Plaintiff "to the U.S. Marshals Task Force searching for the Vicosa children." (Id. ¶ 19.) On November 18, 2021, following "a multi-state manhunt," Mr. Vicosa shot himself and fatally shot both children. (Id. ¶ 20.) On November 22, 2021, District Attorney Sunday "publicly announced that [Ms.] Vicosa had filed a Private Criminal Complaint against Chief Damon . . . [which] the Pennsylvania State Attorney General's Office would investigate due to a conflict of interest." (Id. ¶ 21.)

"[W]ithin twenty-four hours of the public announcement," on November 23, 2021, Plaintiff was "placed on indefinite administrative leave by Board Commissioner Al Granholm and Department Solicitor Attorney Steve Hovis." (Id. ¶ 22.) "The stated bases were: (1) alleged disparaging statements on or off duty; (2) allegedly disclosing Chief Damon's home address to Ms. Vicosa; and (3) explaining to Ms. Vicosa how to file a complaint against Chief Damon." (Id.) Plaintiff alleges that he was "never permitted to complete his supplemental investigative reports, despite his request to do so." (Id.) Plaintiff alleges that Mr. Granholm and Mr. Hovis "explicitly represented that Chief Damon would be fully recused from all aspects of the internal investigation given his status as complainant." (Id.) On December 10, 2021, in an email to Lieutenant Tobin Zech, Chief Damon wrote that as "a party to this investigation," he would "recuse [him]self from communicating with [Lt. Zech] regarding this internal investigation" and

notified Lt. Zech that he was assigned as the "Internal Investigator." (Id. ¶ 25; Doc. No. 28-12.)[6]

Plaintiff asserts that, on December 8, 2021, he was interviewed by Agent Chris Weaver of the Pennsylvania State Attorney General's Office—the agency investigating Ms. Vicosa's criminal complaint against Chief Damon. (Doc. No. 28 ¶¶ 21, 23.) During this interview, Plaintiff "denied providing Chief Damon's home address to Ms. Vicosa and maintained that Chief Damon's order violated Pennsylvania law." (Id. ¶ 23.) Plaintiff would later learn that Ms. Vicosa had confirmed to Agent Weaver that Plaintiff had not provided her with Chief Damon's home address. (Id.)

On December 23, 2021, Plaintiff also "underwent a recoded departmental interview conducted by [Lt.] Zech, with Union Counsel Attorney Ed Paskey present." (Doc. No. 28 ¶ 24.) Plaintiff alleges that, "[b]efore the interview began, Lt. Zech stated the investigation 'could be avoided' if [Plaintiff] 'wanted to do the right thing.'" (Id.) When Mr. Paskey inquired as to the source of the interview questions, Lt. Zech acknowledged they were the questions he "was told to ask." (Id.) Plaintiff also asserts that Mr. Hovis told Mr. Paskey "there was 'no dispute about the facts' and it was 'pretty clear what happened here.'" (Id.)

On February 23, 2022, Chief Damon issued a Loudermill[7] notice charging Plaintiff with ten (10) "Level-6 violations of Department General Order 02-26" consisting of "four counts of Conduct Unbecoming an Officer," "three counts of Insubordination," "two counts of Obedience

---

[6] Plaintiff files as Exhibit 12 to his amended complaint a December 10, 2021 email from Chief Damon to Lt. Zech with the subject line "Internal Investigator." (Doc. No. 28-12.) In the email, Chief Damon advised that Lt. Zech was "assigned as the Internal Investigator to investigate if there [were] any violations" of Pennsylvania state law or the Department's General Orders. (Id.) Chief Damon specified that the date of the violation was November 14, 2021 and that since he was "a party to this investigation[, he would] recuse [himself] from communicating with [Lt. Zech] regarding this internal investigation." (Id.)

[7] See generally Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).

to Orders," and "one count of Confidentiality." (Id. ¶ 25.)

The Loudermill hearing took place on February 28, 2022. (Id. ¶ 26.) Prior to its commencement, Plaintiff alleges that Union President Detective Buschman offered him a demotion in lieu of termination, which Plaintiff declined. (Id.) At the hearing, Plaintiff provided his written response to the charges. (Id.; Doc. No. 28-3 at 1–2.)[8] Chief Damon was present. (Doc. No. 28 ¶ 26.) Plaintiff asserts that, on March 3, 2022, Detective Buschman "conveyed a second final buyout offer of eighteen months' salary," which Plaintiff declined. (Id. ¶ 27.) A few days later, on March 9, 2022, Plaintiff filed a "formal written complaint with the Board against Chief Damon and Lt. Schollenberger, detailing the illegal order and the retaliatory investigation." (Id.; Doc. No. 28-3 at 3–4.)[9] On March 10, 2022, without responding to Plaintiff's complaint from the day prior, the Board voted to demote Plaintiff from Corporal to Officer. (Doc. No. 28 ¶¶ 27–28.) Plaintiff alleges that he first learned of his demotion on March 25, 2022 through a news broadcast. (Id. ¶ 28.)

On March 23, 2022, Mr. Paskey filed a grievance with Chief Damon challenging the demotion pursuant to the CBA.[10] (Id. ¶ 29; Doc. No. 28-5 at 15–16.)[11] Chief Damon denied the

---

[8] Plaintiff files as Exhibit 3 to his amended complaint his February 28, 2022 written responses to the Loudermill notice, addressed to Chief Damon. (Doc. No. 28-3 at 1–2.)

[9] Plaintiff files as Exhibit 3A to his amended complaint the March 9, 2022 formal complaint he filed with the Board regarding the allegedly illegal order and retaliatory investigation. (Doc. No. 28-3 at 3–4.)

[10] The Court notes the discrepancy between Plaintiff's allegations that he did not learn of his demotion until March 25, 2022 and that Mr. Paskey challenged the demotion two days prior, on March 23, 2022. (Doc. No. 28 ¶¶ 28–29.)

[11] Plaintiff files as Exhibit 5C to his amended complaint the March 23, 2022 Step-1 Grievance letter addressed to Chief Damon, the March 31, 2022 response from Chief Damon finding just cause for the demotion and denying the Step-1 Grievance, and the April 8, 2022 Step-2 Grievance letter addressed to the York County Regional Police Commission. (Doc. No. 28-5 at 15–20.)

grievance via memorandum dated March 31, 2022. (Doc. Nos. 28 ¶ 29; 28-5 at 16–17.) Plaintiff then filed a second grievance with the Board on April 8, 2022, which the Board denied. (Doc. Nos. 28 ¶ 29; 28-5 at 19–20.) Pursuant to the CBA's grievance procedure, Plaintiff initiated arbitration on April 29, 2022. (Doc. Nos. 28 ¶ 29; 28-4 at 4.)

On August 4, 2022, the evening before arbitration was scheduled to begin, the parties reached a settlement agreement ("First Settlement Agreement"). (Id. ¶ 30; Doc. No. 28-5 at 9–14.)[12] The First Settlement Agreement provided for "(a) payment of the salary differential lost due to demotion; (b) payment of lost overtime and holiday pay; (c) credit for lost compensatory time; (d) restoration of rank to Corporal; and (e) reassignment to a newly created Administrative Corporal position[13] with agreed-upon overtime compensation." (Doc. No. 28 ¶ 30.) Plaintiff alleges that, by December 22, 2022, Chief Damon had denied him payment of lost overtime as "tentatively agreed" to in the First Settlement Agreement, which Plaintiff "formally disputed" in writing on February 3, 2023. (Id. ¶ 31.)[14] On January 12, 2023, the First Settlement Agreement was executed without modification. (Id.)

---

[12] Plaintiff files as Exhibit 5B to his amended complaint a Settlement Agreement between Plaintiff, the York County Regional Police Commission, and the York County Regional Police Officer's Association, signed by the parties on January 3, 2023 and January 12, 2023. (Doc. No. 28-5 at 9–14.)

[13] Plaintiff files as Exhibit 5 to his amended complaint the Department's job description of the Administrative Corporal role. (Doc. No. 28-5 at 1–3.)

[14] Plaintiff files as Exhibit 5A to his amended complaint an email exchange between Chief Damon and Mr. Buschman, dated December 22–25, 2022, discussing Plaintiff's overtime compensation. (Doc. No. 28-5 at 3–8.) Chief Damon wrote that Plaintiff was "injured prior to the agreement being approved" and thus "would not be eligible for the" disputed overtime "until he is cleared to return to full-duty." (Id. at 5–7.) On December 26, 2022, Plaintiff expressed his disagreement with Chief Damon's decision to Mr. Buschman via email. (Id. at 4–5.) Plaintiff files as Exhibit 6 to his amended complaint a February 2, 2023 complaint regarding his overtime compensation submitted to Chief Damon and the Board. (Doc. No. 28-6.)

On March 6, 2023, following Chief Damon's denial of overtime payment, Mr. Paskey filed an Unfair Labor Practice charge with the Pennsylvania Labor Relations Board for "Defendants' failure to honor the First Settlement Agreement." (Id. ¶ 32.) On August 25–28, 2023, the parties executed another settlement agreement ("Second Settlement Agreement") pursuant to which the Department agreed to pay Plaintiff $3,447.76 within fifteen (15) days. (Id.; Doc. No. 28-8 at 1–4).[15] Plaintiff alleges that around a month later, on September 27, 2023, he received $2,672.88 and that the remaining balance remains outstanding. (Doc. No. 28 ¶ 32.)

Plaintiff asserts that, upon his return to duty on April 25, 2022, he "was immediately subjected to a department-wide campaign of differential treatment directed by Chief Damon and implemented through written directives to supervisory staff." (Id. ¶ 33.) Plaintiff asserts that he "was removed from SWAT/QRT, Firearms Instructor, Active Shooter Instructor, and Honor Guard," his "OIC seniority was stripped," and he experienced "patrol squad reassignment." (Id. ¶¶ 33a–b.) Plaintiff avers that he experienced "[d]eliberate workplace humiliation" when "Chief Damon personally removed computer equipment from" Plaintiff's standard office workstation and moved it to "a glass front counter area" that "was inferior to that of unsworn secretarial employees." (Id. ¶ 33c.) Plaintiff avers that he was "stripp[ed] of his law enforcement authority" when, pursuant to "Chief Damon's comprehensive restriction order," Plaintiff "was barred from wearing a uniform, patrolling, responding to calls, assisting officers, conducting follow-ups, performing vacation checks, or taking any law enforcement action whatsoever" and instead assigned administrative tasks. (Id. ¶ 33d.) Plaintiff alleges that he was denied each of his

---

[15] Plaintiff files as Exhibit 8 to his amended complaint a settlement agreement between Plaintiff, the York County Regional Police Officer's Association, and the York County Regional Police Commission, signed by the parties on August 24, 2023 and August 28, 2023. (Doc. No. 28-8 at 1–4.)

"sixty-four (64) documented overtime postings" due to directives from Lt. Zech and Chief Damon. (Id. ¶ 33e.) Plaintiff also avers that he was denied participation in mandatory trainings[16] and "excluded from mandatory staff meetings" on multiple occasions. (Id. ¶ 33f.) Plaintiff avers that, per Chief Damon's directives, he was "prohibit[ed] from responding to emergency calls" on two separate occasions. (Id. ¶ 33g.) Plaintiff asserts that he experienced "[p]ublic humiliation" at a Halloween parade when he was directed to work the event "in plainclothes and a reflective vest" while other officers were in uniform. (Doc. Nos. 28 ¶ 33h; 28-8 at 12–17.)[17] Plaintiff alleges that he "received no response" to his "secondary employment requests" to join the South Central Task Force, where Chief Damon was the Task Force Manager, or to serve as a Pennsylvania State Constable. (Doc. Nos. 28 ¶ 33i; 28-8 at 5–11; 28-9.)[18] Finally, Plaintiff alleges that he experienced "denial of police function despite manpower

---

[16] Plaintiff files as Exhibit 7 to his amended complaint various emails from Chief Damon and Lt. Zech to the Department, dated May 2023, instructing officers to register for AAIR Trainings. (Doc. No. 28-7 at 1–9.) On May 25, 2023, Plaintiff emailed Peter Montgomery at the Department with his availability for the AAIR training. (Id. at 6.) The same day, Mr. Montgomery responded, "[s]orry, training was denied." (Id.) Per Plaintiff, this AAIR training was "mandatory for all other officers." (Doc. No. 28 ¶ 33f.) Plaintiff files as Exhibit 7A to his amended complaint a November 29, 2022 email to Plaintiff from Lt. Schollenberger advising Plaintiff that he was "scheduled to attend the 40-hour CIT class in October 2023." (Doc. No. 28-7 at 10–12.) On July 19, 2023, Angela Longnecker emailed Plaintiff, Chief Damon, and others a "Training Order" stating that Plaintiff and another officer were "unassigned to CIT training." (Id. at 11–12.)

[17] Plaintiff files as Exhibit 8B to his amended complaint an October 24, 2023 email exchange between himself and Peter Montgomery discussing Plaintiff's attire for a Halloween parade. (Doc. No. 28-8 at 12–17.) Plaintiff wrote that he "was advised by Lt. Schollenberger" that he was "not permitted to wear a uniform." (Id. at 12.) Mr. Montgomery responded that Plaintiff was to wear "[p]lain clothes, vest, and radio." (Id.)

[18] Plaintiff files as Exhibit 8A to his amended complaint a request for secondary employment with the Pennsylvania Central Task Force, dated December 5, 2023. (Doc. No. 28-8 at 5–11.) Plaintiff files as Exhibit 9 to his amended complaint his request for secondary employment with the Pennsylvania State Constable, dated January 9, 2024. (Doc. No. 28-9.)

shortage" at the Department on two separate occasions. (Doc. No. 28 ¶ 33j.) Plaintiff asserts that "[m]ultiple supervisors expressly confirmed" that Chief Damon was the "source" of the differential treatment he experienced. (Id. ¶ 34.) Plaintiff alleges that this treatment violated the Department's "General Order" on supervisor accountability and responsibility, which requires supervisors to "maintain a positive work environment and treat subordinates with dignity." (Id. ¶ 35; Doc. No. 28-11.)[19]

**B. Procedural Background**

On November 15, 2024, Plaintiff filed a complaint (Doc. No. 1) against Defendants alleging four claims: (1) First Amendment retaliation against all Defendants under 42 U.S.C. § 1983; (2) violation of the Pennsylvania Whistleblower Law, 43 P.S. § 1421, against all Defendants for retaliation against Plaintiff in response to his "good faith reports of wrongdoing"; (3) breach of contract against the Department and the Board for violation of "two valid and binding settlement agreements"; and (4) civil conspiracy against all Defendants for "act[ing] in concert to retaliate against Plaintiff for his protected activities." (Doc. No. 1 ¶¶ 26–46.) Plaintiff initially filed the complaint in the United States District Court for the District of Columbia. (Doc. No. 1.) On February 27, 2025, Plaintiff filed a motion to transfer the case to the Eastern District of Pennsylvania, asserting that:

> [a]lthough Plaintiff initially selected the District of Columbia as the forum for this action, upon further consideration, Plaintiff believes that transfer to the Eastern District of Pennsylvania would better serve the convenience of all parties and potential witnesses.

(Doc. No. 7 at 3.) On April 21, 2025, the case was transferred to the Eastern District of Pennsylvania. (Doc. No. 9.) Then, on April 30, 2025, Plaintiff filed another motion to transfer,

---

[19] Plaintiff files as Exhibit 11 to his amended complaint the Department's General Order on supervisor accountability and responsibility, effective January 1, 2022. (Doc. No. 28-11 at 1–7.)

this time to the Middle District of Pennsylvania, describing a "clerical error" in his initial transfer motion to the Eastern District. (Doc. No. 11 at 1.) That same day, the case was transferred to the Middle District. (Doc. Nos. 12, 13.) On August 22, 2025, Defendants filed a motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Procedure 12(b)(6). (Doc. No. 18.) On September 5, 2025, Defendants filed their brief in support of the motion (Doc. No. 20), as well as three exhibits: Ms. Vicosa's private criminal complaint (Doc. No. 20-1); and the two settlement agreements between Plaintiff and the Department (Doc. Nos. 20-2, 20-3). The motion was fully briefed. (Doc. Nos. 23, 24.)

On March 26, 2026, the Court issued a Memorandum and Order granting Defendants' motion to dismiss and permitting Plaintiff to file an amended complaint to attempt to address the pleading deficiencies identified by the Court. (Doc. Nos. 26, 27.) The Court found that Plaintiff's complaint did not set out sufficient factual matter to plausibly allege a First Amendment retaliation claim. (Doc. No. 26 at 15.) This failure pertained to both the citizen speech and public concern elements of Plaintiff's claim. (Id. at 12–13.) First, by not articulating the scope of his duties or any activities that allegedly fell outside that scope, Plaintiff failed to allege that he had engaged in citizen speech. (Id. at 11–12.) Second, by not adequately alleging the nature, scope, or context of his speech, Plaintiff also failed to allege that he spoke on a matter of public concern. (Id. at 13.)

On April 16, 2026, Plaintiff filed an amended complaint alleging five claims: (1) First Amendment retaliation under 42 U.S.C. § 1983; (2) violation of the Pennsylvania Whistleblower Law, 43 P.S. § 1421; (3) breach of contract; (4) violation of procedural due process under 42 U.S.C. § 1983; and (5) civil conspiracy. (Doc. No. 28 ¶¶ 36–53.) After the Court granted Defendants an extension of time to file a response (Doc. No. 30), Defendants filed a motion to

dismiss Plaintiff's amended complaint on May 20, 2026 (Doc. No. 31). Defendants filed a brief in support of their motion (Doc. No. 32) and Plaintiff filed a brief in opposition to the motion (Doc. No. 33). The time for filing a reply brief having passed, the motion to dismiss is now ripe for disposition.

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. See id. The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. As the United States Supreme Court

instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit ("Third Circuit") has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Township, 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III. DISCUSSION

Defendants seek dismissal of each of Plaintiff's claims. The Court first assesses Plaintiff's federal claims (Counts I and IV) before turning to Plaintiff's state law claims (Counts II, III, and V).

Plaintiff asserts two federal claims, First Amendment retaliation (Count I) and violation of procedural due process (Count IV), pursuant to 42 U.S.C. § 1983. Section 1983 permits

private citizens to seek redress for violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

See id. Section 1983 "does not . . . create substantive rights," rather it "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3rd. Cir. 1996). The Court will address Plaintiff's First Amendment retaliation claim before turning to Plaintiff's procedural due process claim.

**A. Plaintiff's First Amendment Retaliation Claim**

"To state a First Amendment retaliation claim, a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action." Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009).[20] The first element is a question of law, and the second is a question of fact. See id. Then, "[i]f these two elements are satisfied, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred." See id. As to the first element:

> A public employee's statement is protected activity when (1) in making it, the

[20] Plaintiff cites Thomas v. Independence Township, 463 F.3d 285 (3d Cir. 2006), which articulates a different test that courts apply when assessing First Amendment retaliation claims by private citizens rather than public employees. See Falco v. Zimmer, 767 F. App'x 288, 298 (3d Cir. 2019) (unpublished) (surveying the case law and explaining that "[a] review of our jurisprudence on such claims reveals that . . . Falco's, not Appellees', version of the elements is applicable here because Falco was a public employee when he experienced the alleged First Amendment retaliation"). Because Plaintiff is a public employee, Gorum provides the applicable test.

> employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made.

See Hill v. Borough of Kutztown, 455 F.3d 225, 241–42 (3d Cir. 2006) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). The Court first addresses the public concern element of Plaintiff's claim before turning to the citizen speech element.

"To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." Connick v. Myers, 461 U.S. 138, 148 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id.

"The content of speech on a matter of public concern generally addresses a social or political concern of the community," for instance speech that "relate[s] to broad social or policy issues," speech "implicat[ing] the discharge of public responsibilities by an important government office," or that which "relate[s] primarily to the way in which a government office [i]s serving the public." See Borden v. Sch. Dist. of Twp. of E. Brunswick, 523 F.3d 153, 169–70 (3d Cir. 2008) (citing cases) (internal citations omitted). Speech content that "seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials" may also relate to a matter of public concern. See Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir.1993) (quoting Connick, 461 U.S. at 148).

"The form and context of the speech may help to characterize it as relating to a matter of social or political concern to the community if, for example, the forum where the speech activity takes place is not confined merely to the public office where the speaker is employed." Id. But

"the community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations." See Azzaro v. County of Allegheny, 110 F.3d 968, 978 (3d Cir. 1997) (citing Connick, 461 U.S. at 146). "Private expression of one's views" may still touch on a matter of public concern. See Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 413 (1979).

In his amended complaint, Plaintiff asserts that he:

> engaged in protected speech on matters of public concern—specifically, law enforcement accountability, child safety, enforcement of lawful court orders, and official misconduct— when he: (a) reported Chief Damon's illegal order at the time it was given and through his chain of command; (b) cooperated truthfully with the Pennsylvania State Attorney General's investigation; (c) reported the illegal order to District Attorney Sunday; (d) filed a formal written complaint with the Board on March 9, 2022 . . . ; (e) provided truthful testimony in his December 23, 2021 recorded interview; and (f) assisted Marisa Vicosa in exercising her constitutional right to petition the government.

(Doc. No. 28 ¶ 38.)

In their brief in support of their motion to dismiss, Defendants argue that "Plaintiff does not allege any wrongdoing" aside from his "conclusory assertion that Chief Damon's order was 'illegal,'" an assertion which, per Defendants, "Plaintiff cannot identify any legal authority to substantiate." (Doc. No. 32 at 13.) Defendants further argue that the "'content, form, and context' of Plaintiff's speech militate[s] against a finding of 'public concern'" because (1) "Plaintiff's speech all concerns the supposed illegality of Chief Damon's order," (2) the "speech was verbal communication directed to other members of law enforcement, and/or the victim of a crime Plaintiff was investigating," and (3) there "was no speech in a public forum," "with a member of the media," "in a context indicating that the public could participate," or "in a medium accessible to the public." (Id.) Instead, Defendants characterize Plaintiff's speech as "an interpersonal dispute which was confined largely to members of law enforcement." (Id.)

In response, Plaintiff argues that his speech involved matters of public concern because it

touched on "[r]eports of governmental misconduct, law-enforcement abuse, or threats to public safety." (Doc. No. 33 at 16.) Plaintiff further argues that "[s]peech may involve public concern even if communicated privately or internally," and does not have to "be made to the media or in a public forum." (Id. at 16–17.)

Upon careful consideration of the allegations of Plaintiff's amended complaint, the parties' briefing, and the applicable law, the Court finds that Plaintiff plausibly alleges that he spoke on matters of public concern as to certain instances of speech, but fails to plausibly allege that he spoke on matters of public concern as to other instances of speech. The Court first addresses each of Plaintiff's alleged instances of speech that touch on matters of public concern.

Plaintiff plausibly alleges that he spoke on a matter of public concern when he "reported the illegal order to District Attorney Sunday"—specifically, when he spoke with Detective Hartman "about his concerns regarding Chief Damon's illegal order" and Detective Hartman "relayed those concerns to District Attorney Dave Sunday." (Doc. No. 28 ¶¶ 18, 38.) Similarly, Plaintiff's allegation that he "filed a formal written complaint with the Board on March 9, 2022" (Doc. No. 28 ¶ 38); see also (Doc. No. 28-3 at 3–4), also plausibly touches on a matter of public concern. Plaintiff asserts that his complaint "against Chief Damon and Lt. Schollenberger" centered not only on the "illegal order" but also the "retaliatory investigation"—referring to an internal investigation conducted by Lt. Schollenberger with Chief Damon as the complainant. (Doc. No. 28 ¶¶ 22, 24, 27); see also (Doc. Nos. 28-3 at 3–4; 28-12). Plaintiff's speech sought "to bring to light actual or potential wrongdoing" on the part of the Chief of Police—the illegal order and the retaliatory investigation. See Connick, 461 U.S. at 148 (emphasis added). Although the form and context of speech are factors that weigh on whether it is of public concern, the fact that Plaintiff's speech was not made in some type of public forum "does not . . .

vitiate the status of the statement as addressing a matter of public concern." See Rankin v. McPherson, 483 U.S. 378, 386 n.11 (1987); see also Connick, 461 U.S. at 147–48 (finding that one question in an internal questionnaire touched on a public concern); Azzaro, 110 F.3d at 978 (reasoning that "[p]rivate dissemination of information" can be public speech if "the message conveyed would be relevant to the process of self-governance if disseminated to the community").

Plaintiff also plausibly alleges that some of his speech touched on a matter of public concern when he "cooperated truthfully with the Pennsylvania State Attorney General's investigation" into Ms. Vicosa's criminal complaint against Chief Damon. (Doc. No. 28 ¶¶ 21, 38.) Plaintiff alleges that he (1) "denied providing Chief Damon's home address to Ms. Vicosa" and (2) "maintained that Chief Damon's order violated Pennsylvania law" in his December 8, 2021 interview. (Id. ¶ 23.) The Court finds that Plaintiff has plausibly alleged that he spoke on a matter of public concern when he discussed an allegedly illegal order in the context of an internal investigation. See Baldassare v. State of N.J., 250 F.3d 188, 196–97 (3d Cir. 2001) (explaining that an internal investigation that "attempted to expose specific wrongs and abuses" is public speech) (quoting Morris v. Crow, 142 F.3d 1379, 1382 (11th Cir.1998)) (cleaned up). By engaging in this speech, Plaintiff sought "to bring to light actual or potential wrongdoing" by Chief Damon. See Connick, 461 U.S. at 148. By contrast, Plaintiff's allegation that his denial that he disclosed Chief Damon's home address is a matter of public concern fails. In so speaking, Plaintiff did not seek to bring to light wrongdoing, but rather to clear himself of wrongdoing. The fact that the speech took place in the context of an internal investigation into potential wrongdoing does not transform the content of Plaintiff's speech. See id. at 197 (explaining that the proper "inquiry focuses on the nature of the information, not its audience").

The Court next addresses the instances of speech that Plaintiff fails to plausibly allege are of public concern. Plaintiff does not plausibly allege that his speech "report[ing] Chief Damon's illegal order . . . through his chain of command" (Doc. No. 28 ¶ 38) is of public concern. Plaintiff alleges that he "sought clarification" from Lt. Schollenberger regarding the order due to "the critical threat Robert Vicosa made" and "telephoned Chief Damon . . . and sent a text message" regarding the order (id. ¶¶ 13–14). The content of Plaintiff's speech was an effort to seek clarification, not report wrongdoing. Regardless, Plaintiff cannot have sought "to bring to light actual or potential wrongdoing" by reporting the order up the chain of command to the same two individuals who originally gave Plaintiff the allegedly illegal order. See Connick, 461 U.S. at 148.

Plaintiff's next allegation of public speech is his December 23, 2021 "truthful testimony," which was given in the context of a "departmental interview" for the broader internal investigation in which Chief Damon, not Plaintiff, was the complainant. (Doc. No. 28 ¶¶ 22, 24, 38.) The speech occurred in the context of an internal Department mechanism to investigate complaints from personnel. In contrast to Baldassare, where the plaintiff spoke on a matter of public concern when he conducted an internal investigation into the alleged criminal actions of officers, Plaintiff participated in an internal investigation of which he was the subject. See Baldassare, 250 F.3d at 192–93 (explaining that an individual who conducts an internal investigation into officials' alleged criminal wrongdoing is engaging in "public speech" because the very purpose of the investigation is to expose wrongdoing). Moreover, Plaintiff fails to allege any details regarding the content of this interview whereby the Court may infer that, despite the context, Plaintiff sought "to bring to light actual or potential wrongdoing." See Connick, 461 U.S. 138, 148.

Lastly, Plaintiff's speech to Ms. Vicosa, which involved explaining how to file a private criminal complaint against Chief Damon (Doc. No. 28 ¶¶ 16, 21) does not plausibly constitute a matter of public concern. Plaintiff alleges that Ms. Vicosa "asked how to file a complaint" against Chief Damon and Plaintiff responded that "she could do so through [the Department] or the York County District Attorney's Office." (Id. ¶ 16.) Although the methods for holding government officials like the chief of police accountable may be of general interest to the public, characterizing the content of Plaintiff's advice to Ms. Vicosa so broadly requires too much extrapolation. Nor does the context and form of the speech—answering a victim's question during an active investigation—weigh in favor of finding it to be a matter of public concern. Speech "does not attain th[e] status [of public concern] because its subject matter could, in different circumstances, have been the topic of communication to the public that might have been of general interest." See Connick, 461 U.S. at 148 n.8. Having concluded that Plaintiff plausibly alleged several instances of speech touching on matters of public concern, the Court turns to the citizen speech element of a First Amendment claim.

The United States Supreme Court, in Garcetti, held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." See Garcetti, 547 U.S. at 421. "The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane v. Franks, 573 U.S. 228, 240 (2014); see also Flora v. County of Luzerne, 776 F.3d 169, 175 (3d Cir. 2015) (explaining that the controlling factor is "whether such utterances were among the things that the employee 'was employed to do'") (quoting Garcetti, 547 U.S. at 421). Further, "the scope and content of a plaintiff's job

responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." See Flora, 776 F.3d at 175.

As described supra, Plaintiff asserts in his amended complaint that he engaged in constitutionally protected citizen speech on six distinct occasions, when he: (1) "reported Chief Damon's illegal order at the time it was given and through his chain of command"; (2) "cooperated truthfully with the Pennsylvania State Attorney General's investigation"; (3) "reported the illegal order to District Attorney Sunday"; (4) "filed a formal written complaint with the Board on March 9, 2022"; (5) "provided truthful testimony in his December 23, 2021 recorded interview"; and (6) "assisted Marisa Vicosa in exercising her constitutional right to petition the government." (Doc. No. 28 ¶ 38.)

In their brief in support of their motion to dismiss, Defendants argue that Plaintiff has not plausibly pleaded that he engaged in protected "citizen speech" as a public employee because he has not articulated the scope of his duties or the speech that fell outside that scope. (Doc. No. 32 at 9.) Defendants rely on Lahovski v. Rush Township, 441 F. Supp. 3d 43, 53 (M.D. Pa. 2020) for the relevant factors for analyzing whether a police officer's speech constituted citizen speech—the employee's duties, the impetus for the speech, the setting and subject matter of the speech, and the identities of the other participants. (Doc. No. 32 at 10.) With respect to the first factor, Defendants argue that reporting Chief Damon's allegedly illegal order falls within the scope of Plaintiff's job duties. (Doc. No. 32 at 10–11.) Defendants again cite Lahovski, 441 F. Supp. 3d at 55, in which the court found that reporting illegal activity to the county prosecutor was within the scope of a police officer's job duties, to support their argument. (Id.) Addressing the remaining factors, Defendants argue that "the impetus and subject matter of the speech all relate to Plaintiff's assigned responsibilities and his professional disagreement with Chief

Damon," and that "[a]ll of the speech at issue was between Plaintiff and other members of law enforcement and/or the victim of the crime which Plaintiff was tasked to investigate" rather than in a public forum or with members of the media. (Id. at 11–12.)

In his brief in opposition to Defendants' motion to dismiss, Plaintiff argues that the proper inquiry is "whether the speech itself was ordinarily within the employee's duties, not merely whether the speech concerned information learned through public employment." (Doc. No. 33 at 15.) Plaintiff argues that "[s]peech to external authorities or outside ordinary reporting channels may constitute citizen speech." (Id.) Plaintiff maintains that his amended complaint "alleges several categories of speech outside routine police reporting duties," but states, without citing any legal authority, that whether those categories of speech "fell within Plaintiff's ordinary duties cannot be resolved on a motion to dismiss." (Id. at 15–16.)

Upon careful consideration of the allegations of Plaintiff's amended complaint, the parties' briefs, and the applicable law, the Court finds that Plaintiff fails to plausibly allege that he engaged in citizen speech. A complaint must set out "sufficient factual matter" to show that a claim is facially plausible. See Fowler, 578 F.3d at 210. Even accepting as true all factual allegations in the amended complaint and construing all reasonable inferences in Plaintiff's favor, Plaintiff has not pleaded sufficient factual matter to plausibly allege a First Amendment retaliation claim.

In Flora, the plaintiff was a public defender who alleged that he engaged in protected citizen speech by "initiat[ing] a class action lawsuit for the benefit of indigent criminal defendants" to compel adequate funding. See Flora, 776 F.3d at 172. The plaintiff alleged numerous job duties and responsibilities in his complaint, including that he was "responsible for his office's representation of its clients," "represented clients in criminal court," and was

responsible for overseeing his office's lawyers and managing its budget. See id. at 176 n.10, 180. The Third Circuit evaluated the "controlling factor" of whether the speech at issue was made pursuant to those alleged duties by analyzing whether the lawsuit was among the categories of things that plaintiff alleged he was employed to do as a public defender. See id. at 177.

By contrast, although Plaintiff's amended complaint cures many of the deficiencies of his initial complaint, it still fails to allege any of Plaintiff's job duties as Corporal with the Department. For example, Plaintiff provides necessary additional context regarding his cooperation with the Pennsylvania State Attorney General's investigation, explaining that it was an investigation into Ms. Vicosa's private criminal complaint against Chief Damon. (Doc. No. 28 ¶ 23). Plaintiff also details that he "denied providing Chief Damon's home address to Ms. Vicosa and maintained that Chief Damon's order violated Pennsylvania law." (Id. ¶ 23). However, Plaintiff cannot plausibly allege that cooperating with an investigation of this nature was not pursuant to his job duties without some assertion of what those duties entailed. See Flora, 776 F.3d at 176 n.10 (analyzing plaintiff's various alleged job duties to determine that his speech fell outside the scope of those duties and thus was citizen speech). The same issue applies to all instances of Plaintiff's alleged citizen speech. Plaintiff's argument that whether his speech "fell within [his] ordinary duties cannot be resolved on a motion to dismiss" (Doc. No. 33 at 16) is unavailing. At the motion to dismiss stage, Plaintiff's amended complaint must set out "sufficient factual matter" to show that his First Amendment retaliation claim is facially plausible. See Fowler, 578 F.3d at 210. Plaintiff must allege some job duties so the Court can assess whether they encompassed the speech alleged. See Flora, 776 F.3d at 175–76 (analyzing whether plaintiff sufficiently alleged that his asserted job duties did not encompass his speech at

the motion to dismiss stage).

Accordingly, the Court finds that Plaintiff's amended complaint does not "plausibly give rise to an entitlement to relief" as to the citizen speech element of a First Amendment retaliation claim. See Santiago, 629 F.3d at 130. The Court will grant the Defendants' motion to dismiss the First Amendment retaliation claim (Count I). The Court turns to Plaintiff's procedural due process claim.

**B. Plaintiff's Procedural Due Process Claim**

Due Process requires that "a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." See Loudermill, 470 U.S. at 542 (1985) (cleaned up). "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source.'" Id. at 539 (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)). "[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" Id. at 541 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

Plaintiff asserts in his amended complaint that he "possessed a constitutionally protected property interest in continued employment as a Corporal, established by the CBA's just-cause requirement." (Doc. No. 28 ¶ 50.) Plaintiff alleges that Defendants violated his procedural due process rights in four ways:

> (a) conducting a pre-determined disciplinary investigation, as demonstrated by Attorney Hovis's pre-interview statement that "there was no dispute about the facts" and Lt. Zech's acknowledgment that "these were the questions I was told to ask"; (b) permitting Chief Damon—the complainant and a directly interested party—to issue the Loudermill notice, preside at the hearing, and deny the Step-1 Grievance in direct violation of the explicit recusal commitments documented by both Commissioner Granholm and Chief Damon's own email of December 10, 2021 (See Exhibit 12); (c) demoting Plaintiff despite the complete discrediting of the primary allegation against him by Ms. Vicosa's own testimony to the Attorney General; and (d) denying Plaintiff the opportunity to complete his supplemental

reports.

(Doc. No. 28 ¶ 51.) As a result, Plaintiff alleges that he "suffered an unlawful demotion and all consequences of the subsequent retaliatory campaign." (Id.)

Defendants argue first that Plaintiff "acknowledges that he received all the procedural due process to which he was entitled" and, second, that Plaintiff "acknowledges the existence and utilization of a robust CBA grievance procedure which, under precedent, provides adequate due process protections." (Doc. No. 32 at 14.) To their first point, Defendants maintain that Plaintiff was "afforded a Loudermill notice and hearing" and does not contend that "he was denied counsel, that he was denied an opportunity to present his side of the case, or that he was denied an opportunity to present the evidence he wished." (Id.) Addressing Plaintiff's allegations regarding Chief Damon's involvement, Defendants argue that the allegations "do not rise to the level of a procedural due process violation" because "due process does not require an impartial investigation nor an impartial pre-termination hearing." (Id.) Defendants argue that, even if Chief Damon was biased, Plaintiff acknowledges that his demotion decision was made by the Board, which Plaintiff does not allege was biased and which provided Plaintiff with an adequate remedy. (Id. at 15.) To their second point, Defendants argue that Plaintiff employed the CBA's "robust grievance process" to "successfully contest his demotion" when he entered into a "settlement agreement whereby he was restored to the rank of corporal." (Doc. No. 32 at 15.) Defendants also argue that Plaintiff was further "able to effectively vindicate his rights" when he filed an unfair labor practices charge through his union representation to recover allegedly unpaid claims from the first settlement agreement. (Id.)

In his brief in opposition to Defendants' motion to dismiss, Plaintiff argues that there were defects in the process afforded to him because it was "tainted by retaliatory bias and participation by the official from whom recusal had been promised," although Plaintiff cites no

legal authority in support of this argument. (Doc. No. 33 at 18–19.) Plaintiff also contends that "the existence of a grievance procedure does not automatically defeat that claim [because] [t]he adequacy of post-deprivation remedies is fact-specific." (Id. at 19.)

Upon careful consideration of the allegations of Plaintiff's amended complaint, the parties' briefs, and the applicable law, the Court finds that, although Plaintiff has plausibly alleged that he has a constitutionally protected property interest in his employment as created by the CBA, he has not plausibly alleged that he was deprived of due process when he was demoted. A "contract with a state entity can give rise to a property right protected by" due process "where the contract itself includes a provision that the state entity can terminate the contract only for cause." See Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1397–99 (3d Cir. 1991); see also Dee v. Borough of Dunmore, 549 F.3d 225, 230 (3d Cir. 2008) (explaining that although a state statute defined the property interest, even without the statute, the employee had "a constitutionally protected property interest based on the terms of the CBA"). Here, Article IV of the CBA that governed Plaintiff's employment with the Department contained a for cause provision: "In recognition of this principle, it is agreed that the following responsibilities are not subject to collective bargaining and the Commission . . . retain[s] the exclusive right hereto . . . [d]iscipline, suspend, demote or discharge employees[21] and any such action to be for just cause." (Doc. No. 28-4 at 2.) "An employee's property interests are created and defined by the terms of his appointment." Dee, 549 F.3d at 231 (cleaned up). The terms of the CBA's for cause provision provided Plaintiff with a constitutionally protected property

[21] Article II of the CBA recognizes that the signatories to the CBA are "appropriate collective bargaining representatives . . . of all non-managerial full-time police officers employed by the York County Regional Police Department." (Doc. No. 28-4 at 2.) The parties do not dispute that Plaintiff, as an employee of the Department, is an employee under the terms of the CBA.

interest in not being disciplined, suspended, demoted, or discharged without just cause. (Doc. No. 28-4 at 2.)

Having established that Plaintiff has a constitutionally protected property interest, the Court must next determine the level of process which he was constitutionally due. See Loudermill, 470 U.S. at 541; Dee, 549 F.3d at 232. This requires considering three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

See Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976). The Court turns first to the second factor—a description of the procedures used and the risk of erroneous deprivation through those procedures. Although "[d]ue process is flexible and calls for such procedural protections as the particular situation demands," see Mathews, 424 U.S. at 334, the "essential requirements of due process . . . are notice and an opportunity to be heard," i.e., a hearing. See Loudermill, 470 U.S. at 546 (explaining that the "opportunity to present reasons, either in person or in writing, why a proposed action should not be taken is a fundamental due process requirement"). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," but the "root requirement" is that "an individual be given an opportunity for a hearing before he is deprived of any significant property interest." See Boddie v. Connecticut, 401 U.S. 371, 378–79 (1971) (emphasis added). As to the notice requirement, "[n]otice is sufficient, 1) if it apprises the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." See Gniotek v. City of Philadelphia, 808 F.2d 241, 244–45 (3d Cir. 1986) (explaining that notice is timely when it provides the employee an "opportunity to present

his side of the story").

Here, Plaintiff alleges that he received notice of the ten (10) Department violations that he was charged with on February 23, 2022, five (5) days prior to the hearing on February 28, 2022 and fifteen (15) days prior to his demotion on March 10, 2022. (Doc. No. 28 ¶¶ 25, 28.) Plaintiff does not allege that this notice was untimely or that it deprived him of an "opportunity to present his side of the story." See Gniotek, 808 F.2d at 245. Moreover, Plaintiff cannot allege that the notice was insufficient to inform him of the nature of the charges when he is able to detail the ten (10) charges against him. (Doc. No. 28 ¶ 25.) Plaintiff also alleges that he participated in the March 10, 2022 hearing and had the opportunity to provide his written response to those charges. (Id. ¶ 26.)

Instead, Plaintiff focuses on four "alleged defects in the process itself." (Doc. No. 33 at 18.) Plaintiff's first three alleged defects—the "pre-determined disciplinary investigation," Chief Damon's involvement in the process, and the decision to demote Plaintiff even though the "primary allegation against him" was "discredited" —all boil down to alleged "retaliatory bias." (Doc. No. 33 at 19.) Plaintiff does not articulate how his fourth alleged defect in the process—that he was denied the opportunity to complete his supplemental investigative reports—taints the process afforded to him, nor does he offer an explanation of the significance of completing these reports. (Doc. No. 28 ¶¶ 22, 51.)

Even accepting as true that the pre-termination process afforded to Plaintiff was tainted by bias, the Court finds that Plaintiff was nonetheless provided with due process. An employee cannot claim that he was "denied due process because his pretermination hearing was held by a biased individual" where there exists "a neutral tribunal at the post-termination stage that can resolve charges of improper motives." See McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995)

(reasoning that, although due process requires an impartial decision-maker before final deprivation of a property interest, strict impartiality is not necessarily required at each stage of that process); see also Jackson v. Temple Univ. of Com. Sys. of Higher Educ., 721 F.2d 931, 933 (3d Cir. 1983) (explaining that the question is not whether the hearings themselves are "inherently biased," but whether plaintiff has received due process). Specifically, "[t]he right to proceed to arbitration provided [plaintiff] with an adequate due process safeguard even if the hearing conducted by the Employer earlier had been inherently biased." See Jackson, 721 F.2d at 933.

Here, the CBA sets out a three-step grievance procedure: (1) a written grievance filed with the Chief of Police; (2) a written appeal to the Board; and (3) arbitration before a single, impartial arbitrator. (Doc. No. 28-4 at 4.) Plaintiff alleges that he utilized every step of this grievance process. On March 23, 2022, Plaintiff's union counsel "filed a Step 1 Grievance . . . challenging the demotion," which was denied by Chief Damon[22] in a written memorandum on March 31, 2022. (Doc. No. 28 ¶ 29.) Plaintiff "filed a Step 2 Grievance . . . with the Board on April 8, 2022 [which] was also denied." (Id.) "Arbitration was initiated on April 29, 2022" in accordance with Step Three (3) of the grievance process. (Id.); see also (Doc. No. 28-4 at 4). The day before the arbitration was scheduled to take place, the parties reached a First Settlement Agreement providing for, among other things, Plaintiff's "restoration of rank to Corporal" and "reassignment to a newly created Administrative Corporal position." (Doc. No. 28 ¶ 30.) Plaintiff does not allege that the Board's involvement in Step Two (2) of the grievance procedure resulted in bias. And, although Plaintiff ultimately did not proceed to arbitration because the

[22] The CBA provides that Step One (1) of the grievance procedure "shall be filed with the Chief of Police" and the "Chief of Police shall respond in writing . . . ." (Doc. No. 28-4 at 4.)

parties reached a First Settlement Agreement, he had the right to do so. (Doc. No. 28 ¶ 30.)

When evaluated using the Mathews factors, these grievance procedures, including the right to arbitration, provided Plaintiff with "adequate due process safeguard[s]." See Jackson, 721 F.2d at 933; see also Dykes v. Se. Pennsylvania Transp. Auth., 68 F.3d 1564, 1571 (3d Cir. 1995) (confirming "that grievance procedures outlined in collective bargaining agreements can satisfy due process requirements"). Although Plaintiff's interest in maintaining his job status and rank is substantial, "the risk of an erroneous determination in the grievance [and] arbitration procedure is not large, and the value of additional or substitute procedures is not great." See Dykes, 68 F.3d at 1572. Accordingly, because the Court finds that Plaintiff's amended complaint does not "plausibly give rise to an entitlement to relief" as to his procedural due process claim, the Court will grant Defendants' motion to dismiss Plaintiff's due process claim (Count IV). See Santiago, 629 F.3d at 130.

### C. Leave to Amend

Rule 15(a) of the Federal Rules of Civil Procedure authorizes a party to amend his pleading once as a matter of course within twenty-one (21) days after serving it, or if the pleading is one to which a responsive pleading is required, twenty-one (21) days after service of the responsive pleading, or twenty-one (21) days after service of a dispositive motion under Rule 12, whichever is earlier. See Fed. R. Civ. P. 15(a)(1)(A) and (B). "In all other cases, a party may amend its pleading only with the opposing party's written consent, or the court's leave," which courts are to freely give "when justice so requires." See Fed. R. Civ. P. 15(a)(2). Consistent with this policy, leave to amend rests in the discretion of the court and may be denied if the court finds "undue delay, bad faith or dilatory motive on the part of the movant, failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by

virtue of the allowance of the amendment, futility of amendment, etc." See Foman v. Davis, 371 U.S. 178, 182 (1962); see also Phillips, 515 F.3d at 236 (finding that "a district court must permit a curative amendment, unless an amendment would be inequitable or futile"). Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted. See Shane v. Fauver, 213 F.3d 113, 119 (3d Cir. 2000) (explaining that futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted").

The Court will dismiss Plaintiff's First Amendment retaliation claim (Count I) without leave to amend. The Court previously afforded Plaintiff the opportunity to cure the deficiencies in his initial complaint—his failure to articulate the scope of his job duties or detail the speech which fell outside these bounds. (Doc. No. 26 at 11–12.) Although Plaintiff's amended complaint provides additional details concerning the speech at issue, it still fails to allege any of his job duties. It is this crucial element which prevents Plaintiff from plausibly asserting a First Amendment retaliation claim. See Flora, 776 F.3d at 175–76 (analyzing, at the motion to dismiss stage, whether plaintiff's speech fell outside the bounds of his alleged job duties to determine if plaintiff engaged in citizen speech as required for a First Amendment retaliation claim). Because the Court already permitted Plaintiff with an opportunity to cure this deficiency, and Plaintiff failed to do so, the Court finds that any further amendment would be futile.

The Court will also dismiss Plaintiff's due process violation claim (Count IV) without leave to amend. Even accepting all of Plaintiff's facts as true, he has not pleaded a plausible due process violation; rather, Plaintiff's alleged facts demonstrate that he indeed received due process when he received notice of the charges against him, provided his written responses to those charges at a hearing, had the right to arbitrate, and engaged in a multi-step grievance procedure culminating in two settlement agreements. As such, although this is the first time the

Court has evaluated Plaintiff's procedural due process claim, the Court finds that amendment would be futile. See Shane, 213 F.3d at 119.

**D. Plaintiff's State Law Claims**

The remaining counts in Plaintiff's amended complaint consist of state law claims (Counts II, II, and V). Because the Court finds that because Plaintiff has not plausibly pleaded a First Amendment retaliation claim or a procedural due process claim, there is currently no viable federal claim before the Court to support the exercise of supplemental jurisdiction over Plaintiff's state law claims. See 28 U.S.C. § 1367(c)(3); see also Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (internal citations omitted) (stating that "[t]his Court has recognized that, 'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so'"). Accordingly, finding no affirmative justification for exercising supplemental jurisdiction here, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and will dismiss the remaining counts without prejudice to Plaintiff's ability to reassert the claims in state court.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania